IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


THE CINCINNATI INSURANCE COMPANY    :        CIVIL ACTION
                                                :
    v.                                       :
                                                :
STONEBRIDGE FINANCIAL CORPORATION,    :        NO.  2:10-CV-4131
et al.                                       :

June 23, 2011

MEMORANDUM AND ORDER

Plaintiff Cincinnati Insurance Company seeks a declaration that no coverage exists for an

underlying suit against its former insureds, Defendants Stonebridge Bank, Joseph Spada, and

David Keller.  Presently before the Court are the parties' cross-motions for summary judgment

(Docs. No. 23 & 24), and responses in opposition (Docs. No. 33 & 34).  Upon careful

consideration of the parties' briefs and applicable case law, the Court DENIES Plaintiff's Motion

and GRANTS Defendants'.

I.      INTRODUCTION

We are asked to determine whether an errors-and-omissions insurance policy provides

coverage for a lawsuit brought against a bank for its alleged wrongful failure to extend credit.

Stonebridge Bank ("Stonebridge") entered into an agreement to extend credit to Engel Group,

LLC ("Engel") but failed to honor that agreement, asserting that it believed the agreement had

expired.  Engel brought action against Stonebridge, claiming it suffered damages and lost profits

due to Stonebridge's breach of contract.  Stonebridge, in turn, sought coverage for the lawsuit

from Cincinnati Insurance Company ("Cincinnati"), its errors-and omissions ("E&O") insurer.

Cincinnati initially recognized a defense obligation, but reserved its right to disclaim coverage at

a later date.  On August 16, 2010, Cincinnati filed this action, seeking a declaration that the

insurance policy it issued to Stonebridge does not provide coverage for Engel's claims against

Stonebridge. Stonebridge filed a counterclaim, seeking a declaration that coverage exists. Both

parties now seek summary judgment.

II.     BACKGROUND

        A.      The Policy

        In 2007, Cincinnati issued an errors-and-omissions insurance policy—the Financial

Institutions Blue Chip Policy (the "Policy")—to Stonebridge, covering the period March 25,

2007 to March 25, 2010. Cincinnati undertook to pay all monetary damages that Stonebridge

"become[s] legally obligated to pay on account of any 'claim' for a 'wrongful act.'"[1] (Doc. No.

3, Ex. A-1, p. 13-15.) The policy defines "wrongful act" as "any actual or alleged error,

misstatement, misleading statement, act, omission, neglect or breach of duty committed . . . by . .

. [Stonebridge] in the performance of 'professional services.'" (Doc. No. 3, Ex. A-1, p. 15.)

"Professional services" refers to "activities allowed under the law and regulations governing

financial institutions which are performed for or on behalf of any client or customer of

---

[1]This language is contained in Part I of the Policy, captioned "Directors and Officers
Liability and Company Coverage." Section I of this Part, titled "Insuring Agreements,"states:

> We will pay on behalf of the "company" all "loss" which the "company" is
> required to pay resulting from any "claim" first made during the "policy
> period,"or any "extended reporting period" included in or endorsed to the policy,
> against the "company" for a "wrongful act."

Section II, titled "Definitions," indicates that "loss" means:

> [T]he total amount of monetary damages which the "insureds" become legally
> obligated to pay on account of any "claim" for a "wrongful act" with respect to
> which coverage hereunder applies, including damages, judgments, settlements,
> and "defense costs."

[Stonebridge]."  (Id.)

The policy also features a contractual liability exclusion and an endorsement—two

provisions that are at the heart of the parties' disagreement.  Part V, Section I.I of the Policy (the

"Exclusion") provides that Cincinnati is not liable to pay, indemnify, or defend any claim:

> [b]ased upon, arising out of, directly or indirectly resulting from or in consequence
> of, or in any way involving legal liability assumed by any of the "policy insureds"
> under the terms, conditions, or warranties of any oral or written agreement, or by
> virtue of any waiver or release from liability of any third party . . . .

(Doc. No. 3, Ex. A-2, p. 9.)  And, the Financial Institution Coverage Amendatory Endorsement

(the "Endorsement") adds the following language to the Policy:

> It is further understood and agreed that this policy shall be amended to include
> coverage for any claim or claims arising out of any "wrongful lending act" related
> to an extension of credit or refused extension of credit to a "borrower."[2]

 (Doc. No. 3, Ex. A-3, p. 11.)

B.      The Underlying Litigation

 On May 7, 2007, Stonebridge issued two loan commitment agreements (the

"Commitments") to Engel, a small home builder.  The Commitments, originally set to expire on

September 30, 2008, expressed Stonebridge's promise to extend credit to Engel in the total

amount of $5,145,000, in exchange for Engel's compliance with certain conditions.  On

---

[2]The term "wrongful lending act" is defined as:

> any negligent act or omission, error, mistatement, misleading statement, or neglect
> or breach of duty by the Company;

and the term "borrower" is defined as:

> any person or entity which is not directly or indirectly affiliated with the Company
> in any respect and to which an extension of credit or refusal to extend credit was
> made or negotiated.

September 24, 2008, Stonebridge and Engel agreed, in writing, to extend the end date to October 31, 2008. (Engel Group, LLC v. Stonebridge Bank, et al., No. 08-cv-6020, Compl. ¶ 13.) According to Engel, Stonebridge later orally modified the Commitments to further extend them to November 20, 2008, but then failed to appear at closing on that day. (Id. at ¶¶ 14-21.) Engel then filed suit in this Court (the "Lawsuit"), (see Engel Group, LLC v. Stonebridge Bank, et al., No. 08-cv-6020), alleging that the Commitments induced it to: (1) enter into a contract to purchase some property from Lehman Brothers; (2) pay a $550,000 deposit; and (3) bear other costs in preparation for construction on the property. (Id. ¶¶ 11-70.) The Lawsuit advances alternative theories of liability: breach of contract and promissory estoppel. In response, Stonebridge and its officers insist that there was no oral modification, and point out that Engel did not comply with the Commitments' conditions by the October 31, 2008 end date. (Stonebridge Ans. ¶¶ 14-58; Stonebridge Pre-trial Memo. p. 3.) Thus, Stonebridge argues, its refusal to fund and/or renew the expired Commitments was entirely justified. (Id.)

   C.      The Present Action

Stonebridge submitted the Lawsuit to Cincinnati for coverage, asserting that: (1) Engel was a "borrower" as defined in the Policy; and (2) Engel accuses Stonebridge of committing "wrongful lending acts" related to "an extension of credit" as required by the Policy's Endorsement. (See Defs.' Ans. & Countercl., Doc. No. 10.) Cincinnati counters that because the Lawsuit arises out of liability "assumed" by Stonebridge under the Commitments, the Policy's Exclusion precludes coverage. (Compl. ¶ 47.) Cincinnati filed this action on August 16, 2010

pursuant to 28 U.S.C. §§ 2201 & 2202, seeking a declaratory judgment[3] that no coverage exists

and there is no duty to defend or indemnify Stonebridge for the Lawsuit's costs. Stonebridge

filed a counterclaim, seeking a declaration that coverage exists.[4] Both parties concede that there

are no genuine factual disputes[5] and that the interpretation of the insurance contract is

appropriately resolved as a matter of law.[6]

III.     ANALYSIS

We must determine whether Engel's claim is within the Policy's coverage or is barred by

an exclusion. See Snyder Heating Co. Inc. v. Pa. Mfrs.' Ass'n. Ins. Co., 715 A.2d 483, 484 (Pa.

Super Ct. 1998) ("A court's first step in a declaratory judgment action concerning insurance

coverage is to determine the scope of the policy's coverage."). First, we resolve the parties'

central dispute—the applicability of the Policy's provision excluding coverage for "liability

assumed under contract." Next, we determine the scope of the Policy's coverage for errors,

misstatements, acts, or omissions committed in the performance of professional services. Then,

once we have ascertained the scope of coverage, we address Cincinnati's contention that

Stonebridge cannot obtain a declaratory judgment on the existence of coverage and the duty to

---

[3]The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

[4]Cincinnati maintains that Stonebridge cannot obtain this relief. See infra, section III.C.

[5]The Court grants summary judgment where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

[6]Under Pennsylvania law, which the parties agree govern, the interpretation of an insurance contract is a question of law. See Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897 (Pa. 2006).

indemnify.

In analyzing the Policy at issue, the Court abides by Pennsylvania case law which instructs courts to: (1) construe ambiguous policy provisions in favor of the insured, see Medical Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (applying Pennsylvania law)[7]; (2) interpret coverage clauses to "afford the greatest possible protection to the insured," Westport Ins. Corp. v. Bayer, 284 F.3d 489, 498 n.7 (3d Cir. 2002) (applying Pennsylvania law); and (2) require the insurer to prove the applicability of any exclusions or limitations on coverage, Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law).

A.      "Contractual liability exclusion"

Cincinnati's primary contention is that its duties under the Policy are limited by the Exclusion, a provision that excludes coverage for claims based upon, or arising out of, "liability assumed under contract." (See Doc. No. 3, Ex. A, p. 10.) Cincinnati essentially argues, and Stonebridge concedes, that this phrase excludes coverage for all liability stemming from a contract—regardless of whether the insured actually *assumed* such liability in the contract, or merely *incurred* a liability pursuant to the contract.

Cincinnati relies on a line of Pennsylvania and Third Circuit cases denying coverage for breach of contract claims under comprehensive general liability ("CGL") policies. See Specialty Surfaces Int'l v. Continential Cas. Co., 609 F.3d 223 (3d Cir. 2010); Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591 (3d Cir. 2009); Kvaerner Metals, 908 A.2d at 897; Snyder Heating

_____

[7]Under Pennsylvania law, a policy provision is ambiguous if it is reasonably susceptible to two interpretations. See Medical Protective Co., 198 F.3d at 103.

6

Co. Inc. v. Pa. Mfrs.' Ass'n. Ins. Co., 715 A.2d 483, 484 (Pa. Super. Ct. 1998); Redevelopment

Auth. of Cambria Cnty. v. Int'l Ins. Co., 685 A.2d 581 (Pa. Super. Ct. 1996). CGL policies

provide coverage for personal injury or property damage resulting from an "occurrence," which

is defined as "an accident, including continuous or repeated exposure to substantially the same

general harmful conditions." See Specialty, 609 F.3d at 227; Nationwide, 562 F.3d at 594;

Snyder, 715 A.2d at 485; see also Redevelopment Auth., 685 A.2d at 589 ("The purpose and

intent of [a CGL] policy is to protect the insured from liability for essentially accidental injury to

the person or property of another . . . .")

This line of cases found that CGL policies did not provide coverage for breach of contract

claims because such claims were not "occurrences" or "accidents." See, e.g., Redevelopment

Auth., 685 A.2d at 589 (holding that insurer had no duty to defend or indemnify because "the

underlying suit arises out of a breach of contract which is not an accident or occurrence

contemplated or covered by the provisions of a general liability insurance policy"); Nationwide,

562 F.3d at 598 (upholding the district court's finding that a breach of contract did not trigger

coverage under a CGL policy because it "do[es] not arise from a covered 'occurrence[]'") None

of these courts based their decisions on a contractual liability exclusion like the one Cincinnati

relies on here.[8]

_____

[8]In fact, only one of those cases—Snyder, 715 A.2d 483—involved an exclusion for
"liability assumed under contract," but the Snyder court's decision did not turn on that phrase.
Specifically, the Snyder court analyzed a policy that contained two contract-related exclusions,
respectively precluding coverage for: (1) "'bodily injury' or 'property damage' for which the
insured is obligated to pay damages by reason of the assumption of liability in a contract or
agreement"; and (2) "a failure [by the insured] to perform a contract or agreement in accordance
with its terms." Snyder, 715 A.2d at 485. The Snyder court based its denial of coverage for the
insured's breach of contract claim on the second exclusion. See Snyder, 715 A.2d at 487 ("[T]he
CGL policy clearly excludes from coverage breaches of contract; the policy language provides

7

Unlike the policies addressed in these cases, Cincinnati's policy provides errors-and-

omissions (E&O) professional liability insurance.  E&O policies differ substantially from CGL

policies.  While CGL policies provide coverage for losses due to bodily injury and/or property

damage caused by an accident, E&O policies provide coverage for "liability resulting from

covered acts, errors or omissions in the performance of 'professional services.'"  4 NEW

APPLEMAN INSURANCE LAW PRACTICE GUIDE §§ 38.05, 38.02, & 38.04 (Jeffrey E. Thomas et

al. eds., LexisNexis 2011 ed.); see also, 4 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION

§ 25.01 (Jeffrey E. Thomas & Aviva Abramovsky eds., LexisNexis 2010) ("Unlike general

comprehensive insurance, E&O insurance insures against a special risk inherent in the practice of

[a] profession, such as negligence, omissions, mistakes, and errors.").  The coverage distinction

between CGL and E&O policies is clear: bodily injury and/or property damage do not include

claims for economic loss resulting from malpractice; and rendering or failing to render

professional services generally does not fit the definition of an accident.  See Thomas et al. eds.,

4 NEW APPLEMAN INSURANCE LAW PRACTICE GUIDE, supra, at § 38.05.  Thus, Cincinnati's

reliance on cases involving CGL policies[9] is misplaced.  Breaches of contract are not, and cannot

---

that the insurance contract will not apply to [the insured's] failure to perform a contract or
agreement in accordance with its terms.")

[9]Cincinnati cites one non-CGL case—Cont'l Cas. Co. v. Cnty. of Chester, 244 F. Supp.
2d 403 (E.D. Pa. 2003)—which involved a Public Officials Liability Policy covering "those sums
that the insured becomes legally obligated to pay as compensatory civil damages arising out of a
'wrongful act' to which insurance applies."  Id., at 408.  That policy included an exclusion for
"any claim arising out of a breach of contract, or out of liability assumed by an insured under any
contract or agreement."  Id., at 409.  The Chester court found that "because the insurance policy
excludes from coverage any claim arising out of a breach of contract, [the insurer] has no
obligation to defend any contract claim."  However, as we explain in this opinion, the phrase
"arising out of a breach of contract" is conceptually and legally distinct from "liability assumed
under contract."

be, automatically excluded from coverage in *all* types of insurance policies simply because they are excluded in CGL policies (which require injury caused by an "accident").

We also reject Cincinnati's related suggestion that public policy considerations prohibit construing insurance policies to provide coverage for breach of contract claims. To support this position, Cincinnati relies on another inapposite line of cases. See HK Systems, Inc. v. Eaton Corp., 553 F.3d 1086, 1091 (7th Cir. 2009) (finding that "without express language[,] an indemnitor will not be found to have agreed to indemnify an indemnitee against the consequences of the breach of a contract that the latter signs *after* the indemnity contract or the formal insurance contract goes into effect") (emphasis in original); Waste Corp. of Am. v. Genesis Ins. Co., 382 F. Supp. 2d 1349 (S.D. Florida 2005) (concluding that a directors-and-officers policy did not cover liability for intentional misconduct by the insured company); Jerry Davis, Inc. v. Md. Ins. Co., 38 F. Supp. 2d 387 (E.D. Pa. 1999) (CGL policy precluded coverage for damages arising from a "delay or failure [by the insured] to perform a contract or agreement in accordance with its terms"). None of these cases pronounce a policy rule barring *any* type of insurance coverage for breach of contract claims. Indeed, these cases implicitly recognize that insurance policies could cover breach-of-contract claims. See, e.g. Waste Corp., 382 F. Supp. 2d at 1356 (acknowledging that "notwithstanding the foregoing [public policy considerations], the question of coverage must still be decided on the basis of the [particular] policy provisions"). Thus, while we agree with Cincinnati that policy considerations may sometimes counsel against construing an insurance policy to cover a breach-of-contract claim, we cannot infer a sweeping public-policy rule from a set of factually and legally distinct cases. See Verticalnet, Inc. v. U.S. Specialty Ins. Co., 492 F. Supp. 2d 452, 460 (E.D. Pa. 2007) (refusing to "extrapolate from

general liability insurance . . . a sweeping public policy that liability insurance of *any* type cannot cover otherwise valid claims if they also arise from a breach of contractual duty").[10]

Moreover, courts have consistently interpreted the contractual liability exclusion at issue here—a preclusion of coverage for "liability assumed under contract"—to apply only to instances where the insured agrees to "assume" the tort liability of a third party, such as in indemnification and hold harmless agreements. See 1 HANDBOOK ON INSURANCE COVERAGE DISPUTES § 7.05 (Barry R. Ostrager & Thomas R. Newman eds., Aspen Publishers 14th ed. 2008) ("This phrase does not refer to the insured's breaches of its own contracts."); Homeowners Mgmt. Enters., Inc. v. Mid-Continent Cas. Co., 294 Fed. App'x 814, 820, n.21 (5th Cir. 2008) (noting that the exclusion for liability "assumed in a contract or agreement" denies coverage where "the insured assumes responsibility for the conduct of a third party"); Provident Bank of Md. v. Travelers Prop. Cas. Corp., 236 F.3d 138, 147 (4th Cir. 2000) (finding that the phrase "liability assumed by the insured under any agreement" applies "only if [the insured's] liability arises secondarily from an agreement to be responsible for a third party's primary liability"); Musgrove v. Southland Corp., 898 F.2d 1041, 1044 (5th Cir. 1990) ("The assumption by contract of the liability of another is distinct conceptually from the breach of one's contract with another. Liability on the part of the insured for the former is triggered by contractual performance; for the latter[,] liability is triggered by contractual breach."); Dreis & Krump Mfg. Co. v. Phoenix Ins. Co., 548 F.2d 681

---

[10]Underlying Cincinnati's arguments is the idea that without a public policy against breach-of-contract coverage, insureds may enter into a contract with no intention of ever abiding by it. However, errors-and-omissions policies generally contain exclusions for claims arising out of deliberately fraudulent, dishonest, criminal or malicious acts or omissions. Cincinnati's Policy contained such an exclusion (see Doc. No. 3, Ex. A-2, p. 8), but neither party contends that it applies in this case.

(7th Cir. 1977) (noting that "liability assumed [by the insured] under any written contract" means "a specific written agreement between the insured and some third party whereby the insured agrees to indemnify the third party").

We find this interpretation compelling, particularly in the context of an E&O policy designed to insure against the special risks inherent in the lending business. Here, the Policy not only insures errors, omissions, or acts committed by Stonebridge in the performance of *professional services*—defined to encompass all of Stonebridge's activities on behalf of its clients—it also specifically covers "claims arising out of any 'wrongful lending act' related to an extension of credit or refused extension of credit to a 'borrower.'" (See Doc. No. 3, Ex. A-3, p. 14). Stonebridge points out that as "all lender liability actions arise out of a contractual relationship" (Doc. No. 25, p. 18), it reasonably expected the Policy to cover "all lender liability practices," whether asserted in negligence or breach of contract.[11] Id. Cincinnati concedes that a bank's lending relationship "is almost always contractual in nature," (see Doc. No. 23, p. 17), but fails to explain the significance of the Endorsement in the context of a policy that excludes all breach-of-contract claims. In other words, Cincinnati fails to answer this crucial question: if the Policy excludes all breach-of-contract claims, then what is the significance of the Endorsement? Thus, Cincinnati has not met its burden of proving the applicability of the Exclusion here. See Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996).[12]

---

[11]We discuss reasonable expectations more fully in III.B.

[12]We note that even if we do not reach the issue of the applicability of the Exclusion, Cincinnati's Policy is ambiguous at best, and must be construed in favor of the insured.

B.      Scope of coverage

Having concluded that the Exclusion does not apply in this case, we move on to

determine whether Stonebridge's conduct falls within the Policy's definition of "professional

services."[13]  Courts consider an insured's conduct a "professional service" if it: (1) arises out of

the insured's day-to-day business operations, Bank of California v. Opie, 663 F.2d 977, 982 (9th

Cir. 1981)[14]; (2) involves specialized knowledge or skill, Marx v. Hartford Accident & Indem.

Co., 157 N.W.2d 870, 872 (Neb. 1986); or (3) implicates a special risk inherent in the practice of

the insured profession, Opie, 663 F.2d 981.

The conduct at issue here—Stonebridge's failure to extend credit pursuant to an

agreement it believed had expired—falls into all three of these categories.  As a financial

institution engaged in lending activities, extending or failing to extend credit is part of

Stonebridge's usual day-to-day business operations.  See Opie, 663 F.2d 977 (finding that a

mortgage broker's misapplication of loan proceeds in breach of its contract with a commercial

bank was part of broker's "day-to-day business operations" and thus constituted a professional

service).  Stonebridge's actions—negotiating a conditional agreement to extend credit to a

borrower, determining whether those conditions were met, and deciding whether to extend the

---

[13]As noted earlier, the Policy defines "professional services" as "activities allowed under
the law and regulations governing financial institutions which are performed for or on behalf of
any client or customer of [Stonebridge]." (Doc. No. 3, Ex. A, p. 15).  As this broad definition
offers little guidance, we turn to case law.

[14]Several federal district and courts of appeals have cited and applied the standard
articulated in Opie.  See, e.g., Home Ins. Co. v. Bullard, 850 F.2d 692, 1988 WL 71192, at *4
(6th Cir. 1988) (table); Curtis Ambulance of Fla., Inc., v. Bd. of Cnty. Comm'rs, 811 F.2d 1371,
1379 (10th Cir. 1987); Am. Cas. Co. of Reading, Pa. v. Kemper, No. 07-1149, 2008 WL
2783272, at *5 (D. Ariz. July 16, 2008); Horizon West, Inc. v. St. Paul Fire & Marine Ins. Co.,
214 F. Supp. 2d 1074, 1078 (E.D. Cal. 2002).

end date for that agreement—also involve specialized knowledge and skill. <u>Contra</u> <u>Massamont</u>
<u>Ins. Agency, Inc. v. Utica Mut. Ins. Co.</u>, 489 F.3d 71 (1st Cir. 2007) (finding that an insurance
agency's diversion of its business in breach of an exclusivity agreement did not constitute
professional service but was merely a business decision); <u>Zurich Am. Ins. Co. v. O'Hara Reg'l</u>
<u>Cntr. for Rehab.</u>, 529 F.3d 916 (10th Cir. 2008) (concluding that a health facility's billing
practices for medicare and medicaid claims did not qualify as "professional services"). Finally,
liability for ultimately refusing to extend credit is clearly a "special risk" inherent in the lending
business. Thus, Stonebridge's conduct qualifies as a "professional service" within the meaning
of the Policy.

Next, we determine the meaning and effect of the Endorsement on the scope of the
Policy's coverage for errors, misstatements, acts, or omissions. The Endorsement adds coverage
for claims arising out of "any *negligent* act or omission, error, misstatement, or neglect or breach
of duty" *related to an extension of credit or refused extension of credit* to a "borrower"
(emphasis added). This addition both elucidates and complicates the original Policy. By adding
the phrase, "related to an extension of credit or refused extension of credit," the Endorsement
expressly clarifies—to the extent that it may have been unclear—that the Policy provides
coverage for claims stemming from a faulty rendition of, or a failure to render, credit services.[15]
However, the Endorsement's definition of "wrongful lending act" conflicts with the original
Policy's definition of "wrongful act." Specifically, the Endorsement adds the term "negligent act
or omission" to the original Policy's definition of a "wrongful act," but explicitly notes that the

---

[15]<u>See</u> Dep. of Ted Doughman, Senior Underwriting Manager for Cincinnati, Doc. No. 29,
p. 27 ("That endorsement is intended to provide some clarity . . . .")

13

definitions set forth in the Endorsement "shall apply to this 'endorsement' only and shall not

apply to the policy to which this 'endorsement' is attached." Because the Endorsement does not

provide any new coverage[16]—it only further delineates coverage that is already afforded by the

original Policy—its language creates ambiguity regarding which definition of "wrongful act"

controls.[17] In accordance with Pennsylvania law, we resolve this ambiguity in favor of

Stonebridge and find the original Policy's definition controlling. See Medical Protective Co.,

198 F.3d at103. Thus, Stonebridge's error—its failure to extend credit pursuant to an agreement

it believed had expired—falls within the Policy's coverage, regardless of whether it was

negligent or not. If Cincinnati wanted to limit coverage to only negligent acts, negligent errors,

or negligent omissions, it should have written the Policy and Endorsement to make this clear. It

did not. Cincinnati, not Stonebridge, bears the consequences of this lack of clarity.

We note that Pennsylvania's reasonable expectations doctrine bolsters our interpretation

of the Policy and Endorsement. See UPMC Health System v. Metro. Life Ins. Co., 391 F.3d 497,

502 (3d Cir. 2004) ("[T]he reasonable expectations of the insured is the focal point of the

insurance transaction . . . regardless of the ambiguity, or lack thereof, inherent in a given set of

documents."). This doctrine "is intended to protect against the inherent danger, created by the

---

[16]The record supports this interpretation. (See Dep. of Ted Doughman, Senior
Underwriting Manager for Cincinnati, Doc. No. 29, p. 27 ("That endorsement is intended to
provide some clarity . . . We do not believe there is additional coverage in that endorsement that
would need additional premium.")

[17]This distinction is important as some courts have construed insurance policies
containing the phrase "negligent acts, errors, or omissions" to mean "negligent act, negligent,
error, or negligent omissions." See Emp'rs Reinsurance Corp. v. Teague, 972 F.2d 339 (4th Cir.
1992); Group Voyagers, Inc. v. Emp'rs Ins. of Wausau, No. C 01-0400, 2002 WL 356653 (N.D.
Cal. March 4, 2002); Arcadia N.E., Inc. v. Thesseus Intern. Asset Fund NV, No. 01-cv-5398,
2003 WL 22057003 (S.D.N.Y. Sept. 4, 2003).

nature of the insurance industry, that an insurer will agree to certain coverage when receiving the insured's application, and then unilaterally change those terms when it later issues a policy." Id. The record here supports Stonebridge's contention that it reasonably expected the Policy to cover "all lender liability practices," whether asserted in negligence or breach of contract. (See Doc. No. 25, p. 18.) Specifically, Stonebridge attached a needs-checklist to its application for insurance. That checklist noted Stonebridge's desire for "coverage for all professional services provided to a third party for a fee, whether such service is provided in accordance with a contract or not." (Doc. No 28, p. 25.) (emphasis in original). Ted Doughman, Cincinnati's insurance underwriter, placed a checkmark next to this request, indicating that it was acceptable and would be provided. (Doc. No. 29, p. 24.) Cincinnati cannot now claim that the policy it issued in response to that request does not cover the very services Stonebridge sought coverage for. See UPMC Health System, 391 F.3d at 503.

### C. Duty to Defend v. Duty to Indemnify

Finally, Cincinnati contends that Stonebridge cannot obtain a declaratory judgment on the existence of coverage and the duty to indemnify because the Bank's ultimate liability on the underlying Lawsuit, if any, has yet to be undetermined. This argument, too, fails. Pennsylvania does distinguish between the duty to defend and the duty to indemnify: an insurer is obligated to defend an insured if the claim is potentially covered by the insurance policy, but is only required to indemnify *after* the insured has been found liable for a claim *actually* covered by the policy. See Gen. Acc. Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095-6 (Pa. 1997). But Pennsylvania allows courts to resolve both the duty to defend and the duty to indemnify in a single declaratory judgment action. See id., 692 A.2d at1095-6 (noting that the question before a court in a

declaratory action is not whether the insurer owes a specified amount—which would be a premature inquiry absent full resolution on the underlying action—but whether the insurer has a duty to indemnify *in the event of* liability on the underlying action); Kvaerner Metals, 908 A.2d at 896 n.7 (acknowledging that both the duty to defend and the duty to indemnify flow from a determination that coverage exists).  Because we find that the Policy provides coverage for the Lawsuit, Cincinnati is obligated to defend Stonebridge in that action.  Cincinnati must also indemnify Stonebridge—in accordance with the Policy's terms—in the event Stonebridge is ultimately found liable.

IV.     CONCLUSION

Accordingly, we GRANT judgment in Stonebridge's favor and against Cincinnati.  The Clerk shall mark this matter statistically closed.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.